UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | <u>MEMORANDUM OF LAW</u> |
| - v. - | : | 08 Cr. 100 (JSR) |
| JOSE RIVERA, | : | |
| Defendant. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - -x

<u>GOVERNMENT'S POST-HEARING MEMORANDUM OF LAW
IN RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS</u>

<u>PRELIMINARY STATEMENT</u>

The Government respectfully submits this Post-Hearing Memorandum of Law in further response to defendant Jose Rivera's motion to suppress. As the testimony of Police Officer Levar Stockton and Sergeant John Gazzola demonstrated, the "stop and frisk" of Rivera on January 4, 2008, near the corner of 219th Street and White Plains Road in the Bronx, was supported by reasonable suspicion. Therefore, the evidence recovered from Rivera as a result of the stop and frisk is properly admissible at trial.

I.    <u>Summary of Testimony</u>

At the suppression hearing, the Government called Officer Stockton and Sgt. Gazzola of the New York City Police Department ("NYPD") (collectively, the "Officers") to discuss the circumstances leading to the stop and frisk of Rivera. Their testimony established that the Officers were in an unmarked police car, driving southbound on White Plains Road, when they first observed Rivera shortly after midnight on January 4, 2008, near a corner known by the Officers to be a high-crime location at which drug sales and robberies, including robberies

1

of livery cab drivers, were common.  (March 26, 2008 Hearing Transcript ("Tr") 7-8, 58-59, 67.)

After they observed Rivera going up to several cars but not getting into the cars, and moving his

head from side to side (Tr. 19, 82), the Officers pulled their car around next to where they had

last seen Rivera to investigate further (Tr. 14).

Sgt. Gazzola, who was in the front passenger seat of the car, then observed Rivera enter

the passenger seat of a green sport utility vehicle ("SUV") that was located in front of their

police car and exit the SUV. (Tr. 14-15, 67, 70-71.)  Police Officer Luis Alemany, who was the

driver of the car, honked the horn of the police car.  (Tr. 15.)  Rivera began to approach the car,

getting within a few feet of the front windshield, but stopped suddenly, made a cutting motion

across his neck with his right hand, and began walking quickly away from the police car.  (Tr.

80.)  Officer Stockton saw a dark object in Rivera's right hand as Rivera made the cutting

motion.  (Tr. 15-16.)  Sgt. Gazzola, who was wearing a gold police shield across his neck at the

time Rivera approached the police car (Tr. 84), observed Rivera make an alarmed facial

expression and grab at his jacket with his left hand (Tr. 67-68).  Both Officer Stockton and Sgt.

Gazzola got out of the police car and pursued Rivera as he attempted to cross the street,

intending to stop Rivera and question him.  (Tr. 16, 68, 85.)

Officer Stockton reached Rivera ahead of Sgt. Gazzola.  As Officer Stockton approached

Rivera, Rivera had his hands in his pockets.  (Tr. 17.)  Officer Stockton asked Rivera to turn

around.  When Rivera took his hands out of his pockets, he had a cell phone in each hand, but

Officer Stockton did not recognize whether the object he had seen earlier was one of the cell

phones.  He began patting Rivera down and asking him questions.  (Tr. 16-18.)  Rivera falsely

pretended he was hearing impaired.  (Tr. 18, 62, 69-70, 74.)  Sgt. Gazzola, who was standing to

the left of Officer Stockton, saw a bulging object wrapped inside of a white sock in the left

inside pocket of Rivera's jacket, which he recalled was open.  (Tr. 70, 83-84.)  Officer Stockton

felt a hard object on Rivera's left side during the external pat-down of Rivera.  Officer Stockton

then reached inside Rivera's jacket and grabbed the object.  After Officer Stockton felt the butt

of a gun, Rivera was placed under arrest.  (Tr. 18-19.)  The Officers found a gun wrapped inside

a sock in the inside left pocket of Rivera's jacket, and cocaine in the inside right pocket of

Rivera's jacket. (Tr. 19-22.)

     II.    <u>Applicable Law</u>

     The well-established legal standards governing a stop and frisk are set forth in greater

detail in the Government's pre-hearing letter dated March 25, 2008 (attached to this

Memorandum as an Appendix).  As explained in the pre-hearing letter, "[u]nder *Terry v. Ohio*,

392 U.S. 1 (1968), police may briefly detain an individual for questioning if they have a

reasonable suspicion that criminal activity is afoot."  *United States v. Elmore*, 482 F.3d 172, 178

(2d Cir. 2007).  "Reasonable suspicion" is measured by an objective test; "the 'actual

motivations of the individual officers involved' in the stop 'play no role' in the analysis."

*Holeman v. City of New London*, 425 F.3d 184, 190 (2d Cir. 2005) (quoting *Wren v. United*

*States*, 517 U.S. 806, 813 (1996)).  When assessing whether an officer's suspicion "that criminal

activity is afoot," *Elmore*, 482 F.3d at 178, was objectively reasonable, a court must consider the

"totality of the circumstances" facing the officer at the time of the stop, *id.* at 179.

     Determining whether the totality of circumstances supported a stop "does not deal with

hard certainties, but with probabilities. . . . [T]he evidence thus collected must be seen and

weighed not in terms of library analysis by scholars, but as understood by those versed in the

field of law enforcement."  *United States v. Cortez*, 449 U.S. 411, 418 (1981).  Accordingly,

evidence that "falls considerably short of satisfying a preponderance of the evidence standard,"

*United States v. Arvizu*, 534 U.S. 266, 274 (2002), can satisfy the test for reasonable suspicion, and "[c]onduct as consistent with innocence as with guilt may form the basis for an investigative stop where there is some indication of possible illicit activity." *United States v. Villegas*, 928 F.2d 512, 516 (2d Cir. 1991); *see also United States v. Sokolow*, 490 U.S. 1, 7 (1989) (finding reasonable suspicion for stop on basis of several factors although "[a]ny one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent [conduct]").

Following a stop, "[a] law enforcement agent, faced with the possibility of danger, has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders, regardless of whether probable cause to arrest exists." *United States v. Alexander*, 907 F.2d 269, 272 (2d Cir. 1990).

III.    Discussion

The Officers' testimony was credible and consistent in all material respects, and should be credited by the Court.[1]  It established the following factors that, taken together, supported the stop and frisk: (1) when the Officers first spotted Rivera, he was engaged in activities that appeared unusual; (2) Rivera was engaged in these activities while standing in a high-crime area after midnight; (3) after the Officers pulled their car around to examine Rivera more closely, he entered and left an SUV that did not resemble a livery cab; (4) once Rivera approached the police car and looked inside, where police officers wearing shields were observing him, Rivera gestured with his right hand to wave off the car, turned around immediately, began walking quickly away from the car and attempted to cross the street; (5) Officer Stockton saw a dark

---

[1] To the extent there were any inconsistencies in the Officers' testimony, "those differences were minor and common among people who observed an event from different angles and points in time during a moment of tension.  When viewed cumulatively, the evidence and testimony is consistent." *Johnson v. People of State of New York*, No. 02-CV-3752(JBW), 03-MISC-0066(JBW), 2003 WL 23198785, at *15 (E.D.N.Y. Nov. 5, 2003).

object the size and shape of a weapon in Rivera's right hand as he gestured with it; (6) Sgt.
Gazzola noticed Rivera assume an alarmed facial expression and grab at his jacket with his left
hand before he turned away; (7) Officer Stockton saw Rivera put his hands in his pockets as he
walked away; (8) Rivera falsely asserted that he was deaf in response to questioning; (9) Sgt.
Gazzola saw a bulge in the inside left-hand pocket of Rivera's jacket; and (10) Officer Stockton
felt a hard object in Rivera's jacket as a result of an initial pat-down.

When the Officers first spotted Rivera, he was approaching livery cabs in a manner that
seemed "to have no rhyme or reason" (Tr. 11), and "moving his head rapidly back and forth"
(Tr. 82). The Officers appropriately considered the dangers of the location at which they first
spotted Rivera, and the time of night at which they observed him, when determining whether
Rivera's activities aroused suspicion. *See Curry v. City of Syracuse*, 316 F.3d 324, 335 (2d Cir.
2003) ("officers are not required to ignore the relevant characteristics of a location in
determining whether the circumstances are sufficiently suspicious to warrant further
investigation"). The Officers' knowledge about the crime problems associated with that
location, including livery cab robberies and drug sales (Tr. 8 (issues with "livery cab drivers
receiving customers and being robbed" and with "drug transactions"), 67 (corner is "known drug
and robbery location")), appropriately influenced their interpretation of Rivera's otherwise
unexplained movements. While Rivera may have been unsuccessfully negotiating with livery
cabs over a fare, it was objectively reasonable for the Officers to conclude that Rivera may have
been attempting to sell drugs or determine whether one of the livery cabs would make a good
"mark" for a robbery (Tr. 58-59 (explaining how conduct was consistent with search for livery
cab driver to rob)), and therefore warranted further investigation.

Rivera's subsequent entry into and exit from an SUV, rather than a livery cab, further

supported the officers' suspicions by increasing the probability that he was not merely attempting to hail a livery cab.[2] (Tr. 70-72 (concern that Rivera "could possibly be getting rid of a weapon or possibly some other illegal substance" while in SUV).) When Rivera turned around suddenly, began walking quickly away from the Officers' car, and attempted to cross the street to get further away from the car (Tr. 16 (Rivera "trying to cross the street"), 68 (Rivera "began to walk swiftly up the street")), it was objectively reasonable for the Officers to assume that Rivera had engaged in sudden flight because he had recognized the individuals in the car as police officers from the shields around their necks (Tr. 67 ("we had our shields out around our necks, and he then began to shake us off")), and other aspects of their appearance, and was attempting to escape from them.[3] *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("nervous, evasive behavior" and "unprovoked flight upon noticing the police" supported finding of reasonable suspicion).

Officer Stockton and Sgt. Gazzola each observed different aspects of Rivera's further suspicious conduct in connection with his flight from the police. Officer Stockton's observations alone, in conjunction with what he had seen before, were sufficient to support the stop and frisk that followed. Officer Stockton saw a dark object in Rivera's right hand before Rivera turned around and began to walk quickly away from the car. Officer Stockton's suspicion that the dark object may have been a weapon (Tr. 17 (concern that dark object could

---

[2] Sgt. Gazzola's efforts to track down the SUV after Rivera's arrest corroborate the Officers' testimony that Rivera's actions in relation to the SUV appeared suspicious. (Tr. 77-79.)

[3] Rivera asserts in his declaration that he did not realize police officers were in the car until he was approached on the street by an officer wearing a badge and vest as he was attempting to hail another cab. (Rivera Decl. ¶¶ 3-4.) This assertion should not be credited. Rivera's alarmed facial expression, gestures with his hands, immediate reversal of direction, and quick effort to cross the street to get further away from the Officers' car supports the inference that Rivera, a convicted felon, was attempting to evade the police in order to prevent them from finding the gun and cocaine that he had stashed within his jacket. In any event, the permissible inferences to be drawn by the Officers from Rivera's conduct do not depend on Rivera's subjective reasons for walking quickly away from the car.

have been "knife" or "firearm")) was objectively reasonable in view of the size of the object and Rivera's efforts to evade the Officers; the gun that was recovered from Rivera and introduced into evidence as Government Exhibit 4, for example, was approximately the size of an individual's hand. That suspicion was not dissipated when Officer Stockton saw Rivera holding cell phones because the phones were not recognizable as the object Officer Stockton had seen earlier, and Rivera had just earlier placed his hands in his pockets, raising the possibility that he had attempted to hide the object in his jacket. (Tr. 17 (Officer Stockton's concern that object "could still be in his jacket" after observing Rivera's hands in his pockets), 18 (even after seeing cell phones, Officer Stockton decided to do an initial pat-down because he wasn't "sure of the object that I saw in the vehicle, if it was the same object").) This conduct justified the initial pat-down of the outside of Rivera's jacket pockets. Rivera's false effort to appear deaf (Tr. 18 (false attempt to appear deaf was "clear indication that just something wasn't right with him")), and Officer Stockton's discovery of a hard object in the inside of Rivera's jacket, supported the further search that resulted in the discovery of the gun in the inside of Rivera's jacket. *See United States v. Welbeck*, 145 F.3d 493, 498 (2d Cir. 1998) (defendant's "evident alarm and evasive behavior" supported search); *United States v. Newton*, 369 F.3d 659, 674 (2d Cir. 2004) (recognizing "important need to allow authorities to graduate their responses to the demands of any particular situation") (internal quotation marks omitted).

The additional suspicious conduct observed by Sgt. Gazzola should also be considered by the Court in determining whether the stop and frisk of Rivera was justified through application of the collective knowledge doctrine. "The collective knowledge doctrine provides that, for the purpose of determining whether an arresting officer had probable cause to arrest, 'where law enforcement authorities are cooperating in an investigation, . . . the knowledge of one is

7

presumed shared by all.'" *Savino v. City of New York*, 331 F.3d 63, 74 (2d Cir. 2003) (quoting *Illinois v. Andreas*, 463 U.S. 765, 772 n. 5 (1983)). The rule exists because, "in light of the complexity of modern police work, the arresting officer cannot always be aware of every aspect of an investigation; sometimes his authority to arrest a suspect is based on facts known only to his superiors or associates." *Id.* (citation omitted). Sgt. Gazzola saw Rivera make an alarmed facial expression and grab at his left side, which he recognized from experience as an indication that Rivera was attempting to hide something from him.[4] (Tr. 69 (describing Rivera's alarmed facial gesture and efforts to back away from car upon seeing him, and explaining why grab at side was cause for suspicion).) When Sgt. Gazzola caught up to Rivera and Officer Stockton, he observed a bulging white sock inside Rivera's jacket (Tr. 84 (explaining positioning of bulging sock in open jacket when first observed), and heard Rivera attempt to trick the Officers into thinking that he was deaf (Tr. 83 (describing Rivera's deceptive conduct "when we stopped him")).

Sgt. Gazzola's observations were more than sufficient to give him reasonable suspicion that Rivera was engaged in criminal activity and was armed. Under the collective knowledge doctrine, those observations are "presumed shared" with Officer Stockton, with whom Sgt. Gazzola was closely cooperating in the investigation and apprehension of Rivera. *Savino*, 331 F.3d at 74.[5] When combined, the collective knowledge of Sgt. Gazzola and Officer Stockton was well over the threshold necessary to establish reasonable suspicion.

---

[4] Officer Stockton explained that his attention was focused closely on Rivera's gesture, during which he saw what he thought might be a weapon, and on the pockets where he had seen Rivera place his hands. (Tr. 60, 63.) Thus, it is unsurprising that Officer Stockton was not able to observe some of the other aspects of Rivera's suspicious conduct seen by Sgt. Gazzola during a swiftly-developing situation.

[5] Application of the presumption that knowledge was shared between the Officers is particularly appropriate here, where Sgt. Gazzola testified that he would generally "talk with [his] partners about investigations as they were developing." (Tr. 85.)

Application of the collective knowledge doctrine is particularly appropriate in this case, where only Officer Stockton's speed in reaching Rivera and the exigencies of the situation prevented Sgt. Gazzola from performing the stop and frisk himself or discussing what he had learned with Officer Stockton. *See, e.g.*, *United States v. Cook*, 277 F.3d 82, 86 (1st Cir. 2002) ("Investigative stops generally occur in a dynamic environment marked by the potential for violence. Officers who jointly make such stops rarely will have an opportunity to confer during the course of the stop. Basing the legitimacy of the stop solely on what the officer who first approaches the suspect knows, rather than on the collective knowledge of all of the officers who participate directly in carrying out the stop, thus makes little sense from a practical standpoint."); *United States v. Ledford*, 218 F.3d 684, 689 (7th Cir. 2000) (applying collective knowledge doctrine to validate search, even though no testimony was elicited on searching officer's knowledge, on grounds that "[b]ecause the search was a joint endeavor, the court may properly consider what . . . the other officers knew. Were it otherwise, the validity of such jointly conducted searches might turn on the fortuity of which officer happened to open a trunk or door, notwithstanding the fact that he and his colleagues were acting in concert." (internal citation omitted)); *United States v. Ragsdale*, 470 F.2d 24, 30 (5th Cir. 1973) (finding automobile search by officer reasonable, even though he had not seen a gun in plain view that had been seen by second officer, because "[i]f [the first officer] had not commenced the search when he did, [the second officer] would surely have commanded it, or would have put [defendant] in [the first officer's] custody and performed it himself.").[6]

---

[6] While the Second Circuit has not yet determined "whether or under what circumstances knowledge known collectively by more than one officer *but not by any single officer* may be aggregated to provide reasonable suspicion or probable cause," *United States v. Colon*, 250 F.3d 130, 136 n.5 (2d Cir. 2001) (emphasis added), the Court does not need to reach this issue. This is so because even if the Court concludes that Officer Stockton's testimony at the hearing, viewed in isolation, did not support a finding that he had reasonable suspicion to stop and

## CONCLUSION

For the reasons set forth above, defendant Jose Rivera's motion to suppress should be denied in all respects.

Dated:      New York, New York
            March 31, 2008

                          Respectfully submitted,

                          MICHAEL J. GARCIA
                          United States Attorney
                          Southern District of New York

By:  s/ Howard S. Master
        Howard S. Master
        Assistant United States Attorney
        Telephone: (212) 637-2248

cc: David E. Patton, Esq.
     Federal Defenders of New York

---

frisk Rivera, Sgt. Gazzola independently had sufficient knowledge to support a reasonable suspicion finding. Moreover, the record establishes that Sgt. Gazzola would have stopped and frisked Rivera—and located the gun—had Officer Stockton not done so first. (*See* Tr. 85 (Sgt. Gazzola exited the car "intending to stop the defendant" after observing suspicious activity but before observing bulging sock in inside of jacket).) To apply the exclusionary rule in this case would improperly make the Court's Fourth Amendment analysis "turn on the fortuity of which officer happened to" reach Rivera first, "notwithstanding the fact that [the Officers] were acting in concert." *Ledford*, 218 F.3d at 689.



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York  10007*

March 25, 2008

<u>By Hand</u>

The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

   **Re:**  ***United States v. Jose Rivera,***
      **08 Cr. 100 (JSR)**

Dear Judge Rakoff:

  The Government respectfully submits this letter in response to defendant Jose Rivera's motion to suppress physical evidence and statements recovered by officers of the New York City Police Department ("NYPD") in connection with his January 4, 2008 arrest for being a felon in possession of a firearm.  In light of the defendant's affirmation in support of his motion, in which he disputes several key events that took place prior to his arrest, the Government has previously consented to an evidentiary hearing.  The Court has scheduled such a hearing for March 26, 2008, at 9:00 a.m.  Although the Government submits this letter in advance of that hearing, it respectfully reserves the right to submit post-hearing briefing regarding the factual and legal issues that arise during the hearing, if necessary.

**BACKGROUND**

  The defendant is charged in a one count Indictment with being a felon in possession of a firearm, in violation of Title 18, United States Code, Section 922(g)(1).  (A copy of the Indictment is attached as Exhibit A.)   The background of this case is set forth in the Complaint filed on January 18, 2008.  (A copy of the Complaint is attached as Exhibit B.)

  According to the Complaint, in the early morning of January 4, 2008, three NYPD officers (collectively, the "Officers") were traveling along White Plains Road in the Bronx in their patrol car in the vicinity of 219th Street, which was known by the arresting officer (called "PO-1" in the Complaint) to be a high-crime location.  (Compl. ¶ 2(a).)  The arresting officer then observed Jose Rivera, the defendant, approaching several vehicles that appeared to be livery cabs without getting into the cabs.  (*Id.* ¶ 2(a)).  The Officers decided to pull the car up alongside Rivera to investigate further.  (*Id.* ¶ 2(a)).  Rivera then began to approach the unmarked police car, which had tinted windows, but suddenly stopped and made a cutting motion with his hand across his neck, which the arresting officer interpreted as an attempt to wave off the police officers who were in the

The Honorable Jed S. Rakoff
March 25, 2008
Page 2 of 7

vehicle. (*Id.* ¶ 2(b).)  The arresting officer saw a black object in Rivera's hand, which he thought might be a weapon, as Rivera made the cutting motion.  Rivera then quickly turned around and began walking away from the police car. (*Id.* ¶ 2(b).)

The arresting officer then got out of the car to investigate Rivera further.  As he approached Rivera, he observed Rivera, who was wearing a baggy jacket, put his hands into the outside front pockets of his jacket and remove them. (*Id.* ¶ 2(c).)  This led the arresting officer to be concerned that Rivera may have concealed in his jacket pocket the dark object that he had seen earlier.  As the arresting officer approached Rivera, he determined that, for his own safety, he needed to stop and pat down Rivera before interviewing him. (*Id.* ¶ 2(c).)  As he reached Rivera, he patted down Rivera's jacket, he felt a hard object on Rivera's left side that felt like the butt of a gun. (*Id.* ¶ 2(d).)  The arresting officer then reached inside Rivera's jacket and recovered a .25 caliber Hawes handgun, loaded with 5 rounds of .25 caliber ammunition, wrapped inside of a sock, from the inside left pocket of Rivera's jacket. (*Id.* ¶¶ 2(d), 4.)  The Officers also recovered a bag containing approximately 9 grams of cocaine from the inside right pocket of Rivera's jacket. ((*Id.* ¶ 2(d).)  Rivera later made incriminating statements to the police.

The Government previously consented to an evidentiary hearing on this matter because the Rivera asserts that he was simply trying to hail a livery cab, and was not engaged in any criminal or suspicious activity at the time the gun was recovered. (Rivera Decl. ¶¶ 2-5.)

APPLICABLE LAW

The Fourth Amendment protects individuals against "unreasonable searches and seizures." U.S. Const. amend. IV.  In the context of this case, the applicable law concerns the ability of the Officers to "stop and frisk" the defendant.

    1.    <u>The Initial Stop</u>

It is well-settled that "[u]nder *Terry v. Ohio*, 392 U.S. 1 (1968), police may briefly detain an individual for questioning if they have a reasonable suspicion that criminal activity is afoot." *United States v. Elmore*, 482 F.3d 172, 178 (2d Cir. 2007); *see also United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995); *United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir. 1992)).  To justify a *Terry* stop, "[p]olice 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion [on a citizen's liberty interest].'" *Elmore*, 482 F.3d at 178-79 (alterations in original) (quoting *Terry*, 392 U.S. at 21).

"Reasonable suspicion" is measured by an objective test; "the 'actual motivations of the individual officers involved' in the stop 'play no role' in the analysis." *Holeman v. City of New London*, 425 F.3d 184, 190 (2d Cir. 2005) (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)).  When assessing whether an officer's suspicion "that criminal activity is afoot," *Elmore*, 482 F.3d at 178, was objectively reasonable, a court must consider the "totality of the circumstances" facing he officer at the time of the stop, *id.* at 179; *see United States v. Cortez*, 449 U.S. 411, 417 (1981); *see also United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000).  In that analysis, factors that by themselves suggest innocent conduct may add up to reasonable suspicion when viewed as a whole. *See United States v. Arvizu*, 534 U.S. 266, 274-75 (2002); *see also*

The Honorable Jed S. Rakoff
March 25, 2008
Page 3 of 7

*United States v. Villegas*, 928 F.2d 512, 516 (2d Cir. 1991) ("Conduct as consistent with innocence as with guilt may form the basis for an investigative stop where there is some indication of possible illicit activity.").

Moreover, reasonable suspicion is measured from the objective perspective of a trained and experienced law enforcement officer. That is because the reasonable suspicion analysis "does not deal with hard certainties, but with probabilities," and properly takes into account that trained law enforcement agents may make observations and draw conclusions that go beyond the capacity of a lay person. *Cortez*, 449 U.S. at 418; *United States v. McCargo*, 464 F.3d 192, 197 (2d Cir. 2006); *Villegas*, 928 F.2d at 517 (suspicion reasonable if conduct appears suspect to trained observer); *see also Ornelas v. United States*, 517 U.S. 690, 699-700 (1996) (while ultimate review of reasonable suspicion determination is *de novo*, deference should be given to experience of police officers involved).

The threshold for reasonable suspicion "falls considerably short of satisfying a preponderance of the evidence standard." *Arvizu*, 534 U.S. at 274; *United States v. Elmore*, 482 F.3d 172, 179 (2d Cir. 2007) (same). Specifically, "reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause [and] can arise from information that is less reliable than that required to show probable cause." *Alabama v. White*, 496 U.S. 325, 330 (1990). It may be based on any of a variety of factors, including an individual's presence in a high-crime neighborhood, "nervous, evasive behavior," and "unprovoked flight upon noticing the police." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *United States v. Muhammad*, 463 F.3d 115, 121 (2d Cir. 2007) ("When the noticed presence of officers provokes a suspect's headlong flight in a high crime area, the officers are justified in suspecting criminal activity on the part of the suspect and a *Terry* stop is warranted."); *United States v. Welbeck*, 145 F.3d 493, 498 (2d Cir. 1998) (stop justified by, *inter alia*, defendant's "evident alarm and evasive behavior" after being alerted to police presence). In short, "the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Wardlow*, 528 U.S. at 125.

2.    **The Frisk**

After stopping a suspect, an officer is permitted to conduct a protective search for weapons if he has "reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Terry v. Ohio*, 392 U.S. 1, 27 (1968); *Ybarra v. Illinois*, 444 U.S. 85, 93 (1979) ("a law enforcement officer, for his own protection and safety, may conduct a patdown to find weapons"); *United States v. Muhammad*, 463 F.3d 115, 124 (2d Cir. 2006) ("A patdown is reasonable to 'allow the officer to pursue his investigation without fear of violence.'") (quoting *Adams v. Williams*, 407 U.S. 143, 146 (1972)). The officer need not be certain that the suspect is armed; rather, an officer may conduct a protective search if a reasonably prudent person in the officer's position "would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27; *United States v. Alexander*, 907 F.2d 269, 272 (2d Cir. 1990) ("A law enforcement agent, faced with the possibility of danger, has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders, regardless of whether probable cause to arrest exists."); *see also United States v. McCargo*, 464 F.3d 192, 200 (2d Cir. 2006) ("[T]he strictures of the

The Honorable Jed S. Rakoff
March 25, 2008
Page 4 of 7

Fourth Amendment must not be so burdensome as to impose unreasonable and avoidable risks on police officers during their investigations.").

A law enforcement officer reasonably can base his determination that a protective search for weapons is necessary based on the totality of circumstances related to the stop, including the location at which the suspect is found; the time of day at which the stop takes place; and the suspect's conduct in connection with the stop. For example, the Second Circuit has held that a protective search for weapons in connection with a *Terry* stop is justified when the stop takes place in a high crime area, and in circumstances that raise the risk to officers associated with the stop. *See Holeman v. City of New London*, 425 F.3d 184, 192 (2d Cir. 2005) ("In the middle of the night, the police were in a high crime area with a convicted narcotics felon who was acting suspiciously. These facts alone suffice to support reasonableness."); *United States v. Paulino*, 850 F.2d 93, 98 (2d Cir. 1988) (holding that "furtive movement provided a legal basis for the protective search").

### EXPECTED EVIDENCE AT HEARING

The Government expects that the evidence at the hearing will show that, shortly after midnight on January 4, 2008, the Officers were on a routine anti-crime patrol, driving along White Plains Road in the 47th Precinct in the Bronx. When they reached the vicinity of 219th Street and White Plains Road, they observed Rivera approaching several vehicles but not getting into the vehicles. The Officers considered this activity suspicious for several reasons: (1) Rivera's activity was consistent with drug sales or with efforts to investigate livery cabs as potential robbery targets; (2) the vicinity of 219th Street and White Plains Road was known to the Officers to be a high-crime location, and in particular a location at which drug sales and robberies frequently took place; and (3) the activity was occurring late at night. The Officers double-parked their patrol car alongside the curb near where Rivera was standing to investigate.

One of the Officers then observed Rivera appear to get into a sport utility vehicle ("SUV"), then emerge. Rivera then began to approach the Officers' car. As Rivera approached the car, he stopped and made a cutting motion across his neck with his hand, quickly turned around, and began walking away from the car. The arresting officer saw a black object, which was the size of a small gun or gravity knife, in Rivera's hand when he made the cutting motion. Another officer also observed Rivera grab at a bulge in his jacket as he turned around and walked away from the car. The arresting officer then got out of the car and began walking towards Rivera. As he approached Rivera, he saw Rivera put his hands into the front pockets of his jacket, which was baggy, and take them out again. When the arresting officer reached Rivera, he identified himself as a police officer and asked Rivera to turn around. Rivera had a cell phone in each of his hands, but the officer did not know whether Rivera had hidden in his jacket pocket the black object that the officer had seen earlier. Rivera then pretended to be deaf, and made noises mimicking the sound of a deaf person speaking, but the two officers who participated in the stop-and-frisk determined that Rivera was attempting to deceive them when the arresting officer asked Rivera a question in a low voice that Rivera answered clearly. The arresting officer conducted an initial pat-down of the front of Rivera's jacket. This pat-down revealed a hard object on Rivera's left side. The arresting officer could not find the hard object in the outside pockets of Rivera's jacket, so he reached inside Rivera's jacket to investigate further. This search revealed a loaded

The Honorable Jed S. Rakoff
March 25, 2008
Page 5 of 7

.25 caliber Hawes handgun with an obliterated serial number, wrapped inside of a white sock, in the inside left pocket of Rivera's jacket. Approximately 8 grams of cocaine and $71 in U.S. currency were also recovered from Rivera incident to his arrest. Rivera later made incriminating statements concerning his possession of the gun and admitted that he was not deaf or hearing impaired.

ANALYSIS

Based on what the Government expects that the evidence at the hearing will show, the defendant's motion should be rejected as contrary to the well-settled principles cited above. The stop and frisk of the defendant was plainly justified because the Officers had reasonable suspicion to believe that Rivera was engaging in criminal activity at the time he was stopped, and that a frisk was justified for the Officers' safety.

Several facts support this conclusion. First, Rivera was engaging in actions at the time the Officers stopped their car that led the Officers to suspect that he might be engaged in criminal activity. At the time the Officers first saw Rivera, he was standing near the corner of 219th Street and White Plains Road approaching cars but not getting into the cars, which led the Officers to suspect that Rivera might be approaching cars to sell drugs or to determine which of the cars would make a good "mark" for a robbery. The Officers relied not only on Rivera's actions, but also on the fact that Rivera was engaging in these actions in a high-crime area after midnight, and on their experiences as trained law enforcement officers who were familiar with that intersection, to reach this determination. *See United States v. Cortez*, 449 U.S. 411, 418 (1981) (noting that the process of determining whether reasonable suspicion exists "does not deal with hard certainties, but with probabilities . . . . [T]he evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement."); *Curry v. City of Syracuse*, 316 F.3d 324, 335 (2d Cir. 2003) ("officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation").

Second, the Officers' suspicions were heightened by Rivera's conduct after the Officers double-parked alongside the curb to investigate further. The Officers observed Rivera appear to enter an SUV, rather than a licensed livery cab, and reemerge. After Rivera began to approach the Officers' car, they observed Rivera make a cutting motion with his hand, and then quickly turn around and begin to walk away. The Officers who will testify at the hearing observed a black object in Rivera's hand which was the size of a gun or gravity knife, and saw Rivera reach for a bulge in his jacket before turning away from them. These suspicious activities, coupled with Rivera's flight, reinforced their suspicion that Rivera was engaged in illegal activity. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("nervous, evasive behavior" and "unprovoked flight upon noticing the police" supported finding of reasonable suspicion). Moreover, the Officers' observations gave them reason to believe that Rivera might be armed; the arresting officer thought that the black object might be a weapon, and the officer who observed the bulge thought that a weapon might be concealed within the bulge. As the arresting officer walked towards Rivera, he saw Rivera put his hands in his pockets and take them out again, which led the officer to be concerned that Rivera might have attempted to conceal in his pocket a weapon that he had previously held in his hand. *See, e.g., United States v. Garcia*, 279 F. Supp. 2d 294, 300

The Honorable Jed S. Rakoff
March 25, 2008
Page 6 of 7

(S.D.N.Y. 2003) (during traffic stop, officer was justified in patting down defendant to determine whether he was carrying a weapon after observing defendant "making furtive movements in an apparent attempt to conceal a 'bulge' in his waist area"); *United States v. Rogers*, No. 95 Cr. 1136, 1996 WL 422260, at *5 (S.D.N.Y. July 29, 1996) (officer was justified in frisking robbery suspect who "kept turning her left side away from [the officer], and at one point appeared to reach toward that side"); *United States v. Padilla*, No. 06 Cr. 824, 2007 WL 1958894, at *7 (E.D.N.Y. June 29, 2007) (finding reasonable suspicion where encounter occurred in high-crime area; defendant was walking with two other individuals in a suspicious manner at night in a poorly light area; and officer testified that "defendant's hand gesture toward his waistband was a familiar one that he had seen numerous times in his experience as a police officer—that of someone adjusting a gun tucked into his pants").

Third, Rivera was evasive in response to questioning by the arresting officer, falsely pretending that he was deaf. This evasive conduct further justified a *Terry* stop and a protective search of Rivera. *See United States v. Welbeck*, 145 F.3d 493, 498 (2d Cir. 1998) (citing defendant's "evident alarm and evasive behavior" as reasons justifying search).

Significantly, the Officers did not immediately commence a full protective search of Rivera's body; rather, one Officer performed a targeted pat-down of the outside of Rivera's jacket in the immediate area where he had seen Rivera place his hands in his pockets. It was only after the external pat-down revealed a hard object that the arresting officer reached inside of Rivera's jacket to withdraw the gun. *See United States v. Casado*, 303 F.3d 440, 449 (2d Cir. 2002) (noting that "*Terry, Sibron* [v. New York, 392 U.S. 40 (1968)], and their progeny teach that the Fourth Amendment protects [a defendant] against an intrusion into his privacy either by a patdown or by an invasion of his clothing, but that the latter is more serious than the former, and that this difference has constitutional significance"); *Terry*, 392 U.S. at 20 (stating that search must be "reasonably related in scope to the circumstances which justified the interference in the first place."). This targeted pat-down was a reasonable and minimally-invasive response to what the Officers perceived as a danger in a "swiftly developing situation." *United States v. Sharpe*, 470 U.S. 675, 686 (1985) (in assessing reasonableness under *Terry*, courts "should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing"); *accord United States v. Newton*, 369 F.3d 659, 674 (2d Cir. 2004) ("[T]he law recognizes the 'important need to allow authorities to graduate their responses to the demands of any particular situation.'" (quoting *Sharpe*, 470 U.S. at 686)). After the arresting officer completed the pat-down and felt what he thought could be a firearm, a further search was wholly appropriate. *See, e.g., United States v. Pitre*, No. 05 Cr. 78, 2006 WL 1582086, at *5 (S.D.N.Y. June 6, 2006) (approving search of inside of defendant's jacket pocket after hard object felt during "grab" of outside of defendant's jacket on grounds that "the grab generated uncertainty; if an officer is legitimately uncertain at that point whether an object felt during a frisk is a weapon, he is entitled to remove it") (internal quotation marks omitted).

The Honorable Jed S. Rakoff
March 25, 2008
Page 7 of 7

For the foregoing reasons, the Government submits that after hearing the live testimony of the Government witnesses, the defendant's motion should be denied in its entirety.

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney

By: _____
Howard S. Master
Assistant United States Attorney
(212) 637-2248

cc:    David E. Patton, Esq. (by hand)

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :          <u>INDICTMENT</u>

     - v. -                        :

JOSE RIVERA,                          :          08 CRIM 100

         Defendant.          :

- - - - - - - - - - - - - - - x

<u>COUNT ONE</u>

The Grand Jury charges:

On or about January 4, 2008, in the Southern District
of New York, JOSE RIVERA, the defendant, after having been
convicted in a court of a crime punishable by imprisonment for a
term exceeding one year, to wit, a conviction on or about
December 11, 1995, in New York Supreme Court, Bronx County, for
Criminal Possession of a Loaded Firearm in the Third Degree, a
Class D felony, in violation of New York Penal Law 265.02(4),
unlawfully, willfully, and knowingly, did possess in and
affecting commerce, a firearm, to wit, a .25 caliber Hawes
handgun, and ammunition, to wit, five rounds of .25 caliber
ammunition, which had previously been shipped and transported in
interstate and foreign commerce.

(Title 18, United States Code, Section 922(g)(1).)


_____
FOREPERSON

_____
MICHAEL J. GARCIA
United States Attorney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

JOSE RIVERA,

Defendant.

INDICTMENT

08 Cr.

(18 U.S.C. § 922(g)(1).)

MICHAEL J. GARCIA
United States Attorney.

A TRUE BILL

Foreperson.

# EXHIBIT B

Approved: _____
          HOWARD S. MASTER
          Assistant United States Attorney

Before:   HON. ANDREW J. PECK
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - x

UNITED STATES OF AMERICA     :     Sealed Complaint

          -v.-               :     Violation of
                                   18 U.S.C. § 922(g)(1)

JOSE RIVERA,                 :     COUNTY OF OFFENSE:
                                   BRONX
              Defendant.     :

- - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

          Alejandro Zapata, being duly sworn, deposes and says
that he is a Police Officer with the New York City Police
Department, and charges as follows:

                          COUNT ONE

          On or about January 4, 2008, in the Southern District
of New York, JOSE RIVERA, the defendant, after having been
previously convicted in a court of a crime punishable by
imprisonment for a term exceeding one year, to wit, a conviction
on or about December 11, 1995, in Bronx County Supreme Court for
Criminal Possession of a Loaded Firearm in the Third Degree, in
violation of New York Penal Law 265.02(4), unlawfully, willfully,
and knowingly did possess in and affecting commerce a firearm, to
wit, a .25 caliber Hawes handgun, which had previously been
shipped and transported in interstate and foreign commerce.

          (Title 18, United States Code, Section 922(g)(1).)

          The bases for my knowledge and the foregoing charges
are, in part, as follows:

          1.   I am a Police Officer with the New York City
Police Department, and I have been personally involved in the
investigation of this matter.  This affidavit is based upon my
conversations with law-enforcement agents and others and my
examination of reports and records.  Because this affidavit is

                              1

being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

2.    From speaking to a New York City Police Department officer ("PO-1") who arrested JOSE RIVERA, the defendant, I learned, in substance and in part, and among other things, the following:

(a)    On or about the early morning of January 4, 2008, PO-1 was a passenger in an unmarked police car that was driving along White Plains Road, in the vicinity of 219th Street, in the Bronx, which PO-1 knew to be a high-crime location. PO-1 observed RIVERA approaching several vehicles that appeared to be livery cabs without getting into the cabs. PO-1, another police officer who was a passenger in the unmarked police car ("PO-2"), and the police officer who was driving the car ("PO-3") decided to pull the car up alongside RIVERA to investigate. The unmarked police car double-parked along White Plains Road near RIVERA, who was standing at the curb.

(b)    RIVERA began to approach the unmarked police car, which had tinted windows, but suddenly stopped as he got near to the car. RIVERA then made a cutting motion with his hand across his neck, which PO-1 interpreted as an attempt by RIVERA to wave off the police officers whom he had observed in the unmarked vehicle. As RIVERA made this motion, PO-1 observed a black object in RIVERA's hand which PO-1 thought might be a weapon. RIVERA then quickly turned around and began walking away from the unmarked police car.

(c)    PO-1 decided to get out of the unmarked police car to investigate RIVERA further. As he walked towards RIVERA, he observed RIVERA, who was wearing a baggy jacket, place his hands into the outside front pockets of his jacket and remove them. RIVERA's actions led PO-1 to be concerned that RIVERA might have attempted to hide in his jacket pocket the black object that PO-1 had seen in RIVERA's hand earlier. As PO-1 approached RIVERA, he determined that, for his own safety, he needed to stop and pat down RIVERA before interviewing him.

(d)    When PO-1 reached RIVERA, PO-1 identified himself as a police officer. RIVERA then turned around to face PO-1, and PO-1 began to pat down RIVERA. As he patted down RIVERA's jacket, he felt a hard object that felt like the butt of a gun on RIVERA's left side. PO-1 reached inside RIVERA's jacket and

2

uncovered a gun, wrapped inside of a sock, from the inside left pocket of RIVERA's jacket. After PO-1 found the gun, he asked PO-2 and PO-3 for assistance in arresting RIVERA, and RIVERA was placed under arrest. After RIVERA's arrest, a bag containing. approximately 9 grams of cocaine was recovered from the inside right pocket of RIVERA's jacket.

3.    Later in the morning of January 4, 2008, I approached JOSE RIVERA, the defendant, and presented him with a document setting forth his Miranda rights. RIVERA waived his Miranda rights in writing. RIVERA then told me that he had found the gun earlier that day in a park, and that he had placed the gun in his coat after finding it. RIVERA also wrote and signed a statement in my presence admitting that he possessed the gun at the time of his arrest.

4.    I learned from NYPD records that the gun recovered from JOSE RIVERA, the defendant, was a .25 caliber Hawes handgun, loaded with 5 rounds of .25 mm ammunition. I have spoken to an agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), who informed me that, based on his training and experience, .25 caliber Hawes handguns are not and have never been manufactured in the State of New York.

5.    I have reviewed the criminal history of JOSE RIVERA, the defendant. RIVERA has been convicted of the following offense: a conviction on or about December 11, 1995, in Bronx County Supreme Court for Criminal Possession of a Loaded Firearm in the Third Degree, in violation of New York Penal Law 265.02(4).

WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of JOSE REIVERA, the defendant, and that he be arrested and imprisoned, or bailed, as the case may be.

Police Officer Alejandro Zapata
New York City Police Department

Sworn to before me this
18th day of January, 2008

HON. ANDREW J. PECK
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

4