UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------X

UNITED STATES OF AMERICA          :          **08 CR. 100 (JSR)**

    - v -          :

**JOSE RIVERA**          :

        Defendant.          :

-----------------------------------------------------X


**DEFENDANT JOSE RIVERA'S POST-HEARING REPLY TO THE GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS**


LEONARD F. JOY, ESQ.
Federal Defenders of New York
Attorney for Defendant
 **JOSE RIVERA**
52 Duane Street - 10th Floor
New York, New York 10007
Tel.: (212) 417-8762

**DAVID E. PATTON, ESQ.**


TO:   MICHAEL J. GARCIA, ESQ.
      United States Attorney
      Southern District of New York
      One. St. Andrew's Plaza
      New York, New York 10007
      Attn: **HOWARD MASTER, ESQ.**
            Assistant United States Attorney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

UNITED STATES OF AMERICA              :            **08 CR. 100 (JSR)**

    - v -                                      :

**JOSE RIVERA**                               :

            Defendant.            :

------------------------------------------------------X


**DEFENDANT JOSE RIVERA'S POST-HEARING REPLY TO THE GOVERNMENT'S
RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS**

**<u>INTRODUCTION</u>**

The Government bears the burden of proving by a preponderance of the evidence that the stop, frisk and search of Jose Rivera on January 4, 2008 was lawful.  Based on the evidence adduced at the hearing on March 26, 2008, the Government has failed to meet that burden.  The police officer who conducted the stop and frisk, Levar Stockton, did not have a lawful basis to do so.  The other officer called by the Government, Sergeant John Gazzola, was wholly incredible, and even if believed, cannot provide the basis for the stop and frisk as he conducted neither.  Contrary to the Government's argument, the collective knowledge doctrine is not applicable here.

For these reasons, the motion should be granted, and the evidence obtained as a result of the search, as well as any fruits thereof, should be suppressed.

**<u>FACTUAL BACKGROUND</u>**

I.  <u>Police Officer Levar Stockton</u>

Officer Stockton conducted the stop and frisk of Mr. Rivera.  He testified that he first saw Mr. Rivera while he and his two partners, Officer Alemany and Sgt. Gazzola, were patrolling in an unmarked sedan with tinted windows traveling southbound on the west side of White Plains Road approaching E. 219th Street in the Bronx.  (Tr., 9-11).  As Officer Stockton described it, he saw Mr. Rivera standing on the passenger side of a livery cab on the opposite side of White Plains Road and

E. 219th Street where Mr. Rivera "peered his head into the window" of a livery cab and then "stepped back." According to Officer Stockton, Mr. Rivera "then proceeded to approach another [livery cab] and do the exact same thing." (Tr., 9). Officer Stockton later clarified that Mr. Rivera did not "literally stick his head into the cab;" instead, he "went up to the window and engaged in a conversation." (Tr. 31).

Officer Stockton stated that he "wanted to continue observing Mr. Rivera" and that after the unmarked passed through the intersection at E. 219th Street he instructed Officer Alemany to "do a U-turn." (Tr. at 13). Officer Alemany then double-parked the car approximately three-quarters of the way to E. 219th Street facing northbound on the east side of White Plains Road. (Tr. at 13, 14). At that time, Officer Stockton stated that Mr. Rivera was walking southbound on the sidewalk along White Plains Road. (Tr. 40, 41). He then saw Mr. Rivera walking past an S.U.V. that was parked legally (i.e., not in the service lane) which obstructed Officer Stockton's view of Mr. Rivera until Mr. Rivera walked past the S.U.V. and appeared again into Officer Stockton's line of sight. (Tr. 14-15, 41-43). Upon Mr. Rivera's appearance from behind the right, back side of the S.U.V., Officer Alemany beeped the horn of the unmarked sedan. (Tr. at 41). Officer Stockton's opinion as to why his partner beeped the horn was to get Mr. Rivera "thinking that we were also a livery cab" and "to get him closer to the vehicle so maybe we could get a better look at him." (Tr., 43).

After Officer Alemany beeped the horn, Mr. Rivera took a step toward the car, looked more closely at the car, then made a cutting motion with his hand as though to wave off the car and turned around and walked away. (Tr. at 44). Officer Stockton testified that he saw a dark object in the same hand that Mr. Rivera used to wave off the car. (Tr. 45, 46). He further stated that he "believe[d] [it] could have possibly been a weapon, and that's why I exited the vehicle." (Tr. at 45). When the Court queried as to why Officer Stockton thought that someone would choose to use the same hand to wave off the car with the hand in which he was holding a weapon, the officer stated that he did not know: "I've seen funnier stuff, Your Honor. I mean, obviously, I can't say. I wasn't Mr. Rivera. I don't know his train of thought. Again, I don't know." (Tr. at 46).

2

After Officer Stockton exited the vehicle, he followed Mr. Rivera who was walking northbound along the sidewalk of White Plains Road toward the intersection of E. 219th Street. (Tr., 16). As Mr. Rivera was starting to cross E. 219th Street, Officer Stockton "stopped him before he was able [to cross] a couple steps off the sidewalk." (Tr., 16). Mr. Rivera initially had his back to Officer Stockton, but when Stockton said "Excuse me, sir," Mr. Rivera turned around. (Tr., 17). When Officer Stockton approached Mr. Rivera, Mr. Rivera's hands were in his jacket pockets. (Tr., 17). "As soon as Mr. Rivera turned around, his hands came out to his side, and [Officer Rivera] noticed a dark colored cell phone in his hand." (Tr., 17). Officer Stockton then described what happened next:

> When Mr. Rivera turned around, even though I saw a dark colored object in his right hand, which I identified at that point to be a cell phone, I still was concerned that he might still have a weapon on him. For my safety and my partner's safety, I then did an exterior frisk of his waistline and his jacket.

(Tr. at 18).

Officer Stockton testified that as he was frisking Mr. Rivera, he asked him, "Is everything okay tonight, sir?" (Tr., 18). Mr. Rivera responded in a manner that made it sound as though he was hearing impaired to which Officer Stockton responded by asking if he was deaf. (Tr., 18). Mr. Rivera told him that he could not hear that well, and Officer Stockton, in order to verify the claim, turned his head away from Mr. Rivera and repeated the question. (Tr., 18, 62). Mr. Rivera answered the question, leading Officer Stockton to believe that "something wasn't right with him." (Tr. 18). Officer Stockton continued to frisk Mr. Rivera and upon feeling "a hard object on his left side," put his hand inside Mr. Rivera's left front pocket, did not feel anything there, felt "inside the inner lining of the left side" of the jacket where he felt "a sock and a hard object." (Tr., 19). The feel of the object made him think it was a gun, whereupon he asked Mr. Rivera what the object was and upon not getting a response, signaled to his fellow officers that he had found a gun. (Tr., 19).

The Court clarified the order of events by confirming with Officer Stockton that the

conversation about Mr. Rivera's hearing occurred, "after you had begun the frisk but before you had gone inside his jacket to get the gun." (Tr., 62). Officer Stockton answered "Yes, Your Honor." (Tr. 63).

II. Sergeant Gazzola

Sergeant Gazzola gave a significantly different account of the events -- one that was wholly incredible. The first time he noticed Mr. Rivera was after the unmarked car had taken a U-turn and was double-parked along the east side of White Plains Road. He testified that he saw Mr. Rivera "get into and out of [a] green SUV rather quickly." Based on nothing more than this single observation, he concluded that Mr. Rivera "could possibly be getting rid of a weapon or possibly some other illegal substance." (Tr., 72). He made this claim despite admitting that he never checked out the SUV at the scene, got its license plate or told either of his partners to make it sure it did not drive away. (Tr. 72, 77, 78). Instead, he made the uncorroborated claim that he later sent a patrol car to find the SUV and that an SUV was found which may or may not have been the one he saw Mr. Rivera get into. (Tr., 78).

Without mentioning that his partner had honked the horn of the unmarked sedan, he testified on direct examination to what he claims happened after Mr. Rivera exited the SUV:

> The individual then approached my car, which was parked on the side of the road, and began looking and gesturing at us as if possibly we were a taxicab. This person then came up to the car. We had our shields out around our necks, and he then began to shake us off. His eyes got very large, began using his arm as if to signify no. And he grabbed his jacket, and then walked away in a very quick, rapid manner.

(Tr. 67). Until admitting on cross-examination that his partner had actually encouraged Mr. Rivera to come over to the unmarked car by honking the horn as though it were a cab, Sergeant Gazzola's account was tremendously misleading. He gave the mis-impression that Mr. Rivera approached the unmarked car of his own accord and that he walked away upon realizing that it contained police. In

4

addition, his testimony about bulging eyes and grabbing his jacket is contradicted by Officer

Stockton's description of Mr. Rivera's behavior.

More incredible still, however, is Sergeant Gazzola's claim that he saw a "bulge" in Mr.

Rivera's jacket. As the Court observed and as the witnesses acknowledged, the gun recovered from

Mr. Rivera, which is less than four inches in length, makes no bulge whatsoever when placed in the

inside pocket of the loosely fitting jacket -- whether zipped or unzipped. (Tr., 49-52, 61, 76-77).

Faced with this incontrovertible fact, Sergeant Gazzola claims to have seen the inside of Mr. Rivera's

jacket: "His jacket was open, and I could look inside the jacket and I could see right inside the pocket.

The pocket was open, and I could see the sock inside the pocket." (Tr., 70). In order to demonstrate

this view, Government counsel held open the jacket to display the inside pocket. As the Court will

recall, without someone holding open the jacket, the jacket falls straight down and the inside is not

visible.[1] Thus, in order to believe Sgt. Gazzola's version of events, Mr. Rivera must have both

clutched his jacket closed upon seeing the unmarked car and then upon being stopped by Officer

Stockton, help open the jacket to display his interior pocket wherein he had a gun.

Not only is the story absurd on its face, but it is also contradicted by Officer Stockton's

account, who testified that he did not see a bulge (Tr., 49) and that he could not see the interior of the

jacket (Tr, 52-53). This, from the officer who was closer to Mr. Rivera, who was actually engaged

with Mr. Rivera, and who conducted the frisk and search of Mr. Rivera.

The final nail in the coffin of Sgt. Gazzola's story is that he claims that Officer Stockton

asked Mr. Rivera what the bulge was before he specifically searched the interior pocket in response to

Officer Stockton seeing the bulge. (Tr., 70, 82). This account, starkly different from Officer

---

[1]  Should the Court have any further question about the possibility of viewing a bulge,
defense counsel requests the opportunity to do a demonstration with the jacket in person.

5

Stockton's, is not a matter of minor detail that Officer Stockton might have mis-remembered.

Sgt. Gazzola's account of events is thoroughly incredible and ought to be disregarded in its entirety. And as discussed further below, even if believed, it has no legal relevance to the basis for the stop and frisk.

## DISCUSSION

A police officer may briefly detain and question an individual without a warrant and without probable cause only where the officer has an objectively reasonable suspicion "that criminal activity may be afoot." Terry v. Ohio, 392 U.S. 1, 30 (1968). In evaluating whether an officer's reasons for a stop are legally sufficient, a court must determine if the officer had a "reasonable suspicion, based on specific and articulable facts, of unlawful conduct." United States v. Bayless, 201 F.3d 116, 132 (2d Cir.2000); see also, United States v. Scopo, 19 F.3d 777, 781 (2d Cir.1994). Courts are to consider the totality of the circumstances in determining "whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." Id.

The standard for conducting a frisk is higher still. In order to conduct a lawful frisk without a warrant and without probable cause to arrest, the police must have an objectively reasonable belief not just that criminal activity is afoot but also that the suspected person is "armed and presently dangerous." Terry 392 U.S. at 24 (officer may conduct a pat-down search "to determine whether the person is in fact carrying a weapon," only where the officer reasonably believes the person "is armed and presently dangerous to the officer or to others."); see also, Ybara v. Illinois, 444 U.S. 85, 93 (1979) ("Nothing in Terry can be understood to allow a generalized 'cursory search for weapons'..."); United States v. Jaramillo, 25 F.3d 1146, 1151 (2d Cir.1994) (in order to frisk for weapons, the police must have a reasonable belief that the individual is "armed and presently dangerous to the officer or others.").

6

Here, Officer Stockton did not have the requisite level of reasonable suspicion for either a stop or a frisk. The <u>Terry</u> opinion itself resolves the issue here: "In determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." <u>Terry</u>, 392 U.S. at 27.

Even under Officer Stockton's own account, his basis for stopping Mr. Rivera was nothing more than a hunch. His basis for frisking him was even more tenuous. The following events constituted his reasons for the stop:

- Mr. Rivera approached two livery cabs and engaged in some sort of conversation with the driver without getting into them;
- When Officer Stockton's undercover sedan, which looked like a livery cab, approached Mr. Rivera and honked the horn, Mr. Rivera initially walked toward the sedan and then waved it off and walked away;
- When Mr. Rivera waved off the sedan, he had a dark object in his hand.

None of those actions, either taken individually or as a whole, objectively and reasonably justified the suspicion that Mr. Rivera was engaged in criminal conduct. Approaching a livery cab and engaging in conversation with the driver is precisely what is required of anyone attempting to hire one. Even accepting Officer Stockton's account that Mr. Rivera approached a second cab (Mr. Rivera maintains his position stated in his affidavit that he only approached a single cab), there is nothing out of the ordinary about that conduct. Indeed, the most Officer Stockton could say about it was the following: "At that time was Mr. Rivera doing anything wrong? Absolutely not. But for me, it called for me just to observe him some more, just be nosey. I'm a police officer. That's my job to be nosey for the community, see what they're doing." (Tr., 58).

With respect to Mr. Rivera's approach of the unmarked car after he was beckoned to approach by Office Alemany's honking of the horn, Officer Stockton never gave any reason why that aroused

suspicion.  Nor was the conduct suspicious in any way.

Lastly, with respect to the small dark object he observed in Mr. Rivera's hand, the most he could say was that it "possibly could have been a weapon," and "[i]t could have been many things." (Tr., 46).  Tellingly, while Officer Stockton stated he didn't know what the object was, he refused to state that he thought it possibly could have been a cell phone while insisting that it could have possibly been a weapon and that it "could have been many things."  (Tr. at 46).  Thus, while reluctant to admit it, he cannot make the claim that he believed Mr. Rivera had a weapon -- only that it was a possibility.  The account does not distinguish Mr. Rivera from anyone else walking down the street who might "possibly" have a weapon.  Officer Stockton's actions also belie how seriously he took this possibility.  He did not indicate to this fellow officers that he thought Mr. Rivera was armed; he did not approach Mr. Rivera with his own weapon drawn -- even when Mr. Rivera pulled his hands out of his pockets after turning to face Stockton; and while frisking Mr. Rivera, he turned his head away from Mr. Rivera to verify Mr. Rivera's claimed hearing impairment -- an action utterly inconsistent with an officer believing that the person with whom he is engaged possesses a weapon.

More importantly, none of Mr. Rivera's actions justified the greater intrusion of a frisk which must be accompanied by a reasonable suspicion that a person is armed and dangerous.  The only additional activity that occurred after the stop and prior to the frisk was that Officer Stockton saw that Mr. Rivera had a cell phone in his hand -- a cell phone that was a small, dark object -- matching precisely the description of what he observed earlier.  Officer Stockton's claim that the cell phone might not have been the object he saw earlier is pure speculation and is not remotely grounded in any objective and articulable fact.  Officer Stockton, while muddling the timing somewhat in his direct testimony, all but admits that he knew it was the same object.  (Tr., 18) ("I then began to frisk Mr. Rivera at that point again, because I wasn't clearly sure of the object that I saw in the vehicle, if it was

8

the same object. I then later identified it, *once I approached Mr. Rivera,* as a cell phone. *I then began to pat down his exterior*...") (emphasis added). Thus, at the time Officer Stockton began frisking Mr. Rivera he had even less of a basis to conclude that he was armed and dangerous as when he observed him from the unmarked car.[2]

As cited in defendant's initial motion to the Court, courts within the Second Circuit have found reasonable suspicion lacking for a Terry stop or frisk under far more suspicious circumstances than those present here. See United States v. Antuna, 186 F.Supp.2d 138, 145 (D.Conn. 2002) (no reasonable suspicion for stop where officer spotted someone he thought was wanted, who quickly looked away upon seeing the police and then intently watched the police after they drove away); United States v. Crump, 62 F.Supp.2d 560, 564 (D.Conn. 1999) (no reasonable suspicion for stop or frisk where officer believed defendant was deliberately trying to avoid a vehicle checkpoint in a high crime neighborhood by turning his car around and then after being stopped began to walk away from officer, acted a little nervous, and placed his hands in his pocket); United States v. Arenas, 37 F.Supp.2d 322, 327 (SDNY 1999) (no reasonable suspicion for stop or frisk where officers spotted a group of three men that appeared to be falsely posing as tourists and walking in an unusual formation, entered a store with one man appearing to act as a lookout and upon making eye contact with the police, left the store, walked quickly away and placed a dark object in his jacket pocket.).

Where the totality of circumstances is devoid of objectively suspicious behavior, the mere accumulation of otherwise innocent behavior cannot suffice to rationalize a stop and frisk. As Judge Chin stated in Arenas when recounting the myriad claims by the police of suspicious behavior and

---

[2] The additional testimony regarding Mr. Rivera's alleged feigning of a hearing impairment is not relevant to the reason for the stop or frisk because the frisk began before that supposed colloquy. (Tr., 62). Nor would it provide a basis for believing someone to be armed and dangerous.

finding the claims lacking under Terry: "[w]hether viewed individually or collectively, virtually every one of the above actions constituted innocent behavior." 37 F.Supp.2d at 327. The same holds true here. Nothing about Mr. Edwards' conduct, either individually or collectively, suggested criminal activity, much less that he was armed and presently dangerous.

Lastly, with respect to Sgt. Gazzola's testimony, it should not be considered at all because of its sheer incredibility, and more fundamentally, because Sgt. Gazzola did not stop or frisk Mr. Rivera, nor did he communicate his alleged observations to Officer Stockton. The collective knowledge doctrine is not applicable here. While the Government is correct that this precise issue is still an open question in the Second Circuit, the Court in Colon made plain that the "primary focus" of the doctrine is "whether the law enforcement officers initiating the search or arrest, *on whose instructions or information the actual searching or arresting officers relied*, had information that would provide reasonable suspicion or probable cause to search or arrest the suspect." United States v. Colon, 250 F.3d 130, 135-36 (2d Cir. 2001) (emphasis added). The doctrine stands for the common sense notion that officers should be able to rely on the information they receive from their colleagues. Officer Stockton did not receive any information or instruction from Sgt. Gazzola regarding the stop and frisk of Mr. Rivera, and Sgt. Gazzola's alleged observations cannot be considered in weighing the legality of the stop and frisk.

The cases cited by the Government on collective knowledge are largely distinguishable from the facts present here, and to the extent they are not, this Court should not rely on their faulty reasoning. If the Court is inclined to rely on the collective knowledge doctrine, the defense requests additional briefing on that issue as there is not space enough here to properly address it.

## CONCLUSION

Undoubtedly, all police officers would feel safer if allowed to frisk everyone with whom they

came into contact.  Every interaction carries some risk, from routine traffic stops to encounters on

urban streets.  But the risks must be weighed against the intrusion on Fourth Amendment privacy

interests, and the Supreme Court and Second Circuit have been clear that in order to conduct a frisk,

an officer must have an objectively reasonable belief, based on specific and articulable facts, that a

person is "armed and dangerous."  The circumstances here fall well short of that standard, and the

motion should be granted.


Dated: New York, New York
     April 3, 2008

                          LEONARD F. JOY, ESQ.
                          Federal Defenders of New York
                          Attorney for Defendant
                           **Jose Rivera**
                          52 Duane Street - 10th Floor
                          New York, New York  10007
                          Tel.:  (212) 417-8762


                          _____

                          **DAVID E. PATTON**

TO:   MICHAEL J. GARCIA, ESQ.
        United States Attorney
        Southern District of New York
        One St. Andrew's Plaza
        New York, New York  10007
        Attn.:  **HOWARD MASTER, ESQ**.
             Assistant United States Attorney